UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| | |
| ZRG, Inc., | Case No. 25-40464-NHL |
| 90 Nassau Street LLC, | Case No. 25-41126-NHL |
| 385 Greenwich Street LLC, | Case No. 25-41127-NHL |
| | |
| Debtors. | Jointly Administered |

------------------------------------------------------------------x

## NOTICE OF SALE RESULTS

PLEASE TAKE NOTICE that Bernart Capital LLC, an affiliate of New Aim Realty LLC

("BC"), has been deemed the high bidder for the Debtors' property at 90 Nassau Street, New

York, NY pursuant to the attached contract of sale annexed hereto as Exhibit "A." BC was

solicited to be the staking horse buyer. BC tendered the required deposit of $600,000 to the

undersigned as escrow agent, as confirmed by the attached wire confirmation annexed hereto as

Exhibit "B". There were no other qualified bids received and the senior lender, Ladder CRE

Finance REIT Inc. (the "Senior Lender"), elected not to credit bid. As a result, the live auction is

canceled and the Debtor will seek Bankruptcy Court approval of BC as the successful purchaser

for purposes of confirming the Debtors' joint liquidating plan of reorganization.

Dated: New York, NY
      June 18, 2025

                                   Goldberg Weprin Finkel Goldstein LLP
                                   *Counsel for the Debtors*
                                   125 Park Avenue, 12th Floor
                                   New York, New York 10017
                                   (212) 221-5700

                                   By: */s/ Kevin J. Nash, Esq.*

STALKING HORSE

PURCHASE

AND

SALE AGREEMENT

by and between

THE BANKRUPTCY ESTATE OF 90 NASSAU STREET LLC

And

BERNART CAPITAL LLC

Dated as of June __, 2025

for

90 Nassau Street
New York, New York
Block: 78
Lot: 43

## STALKING HORSE PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (the "Agreement"), made as of June ___, 2025 between THE BANKRUPTCY ESTATE OF 90 NASSAU STREET LLC, a New York limited liability company, having an address at 3131 Bedford Avenue, Brooklyn, New York 11210 ("Seller"), and BERNART CAPITAL LLC, a Delaware limited liability company, having an address at c/o Edelstein Law Group, P.C., 1350 Avenue of the Americas, 2nd Floor, New York, New York 10019 (hereinafter referred to as "Purchaser").

WHEREAS, Seller is currently operating as a debtor-in-possession in connection with the Bankruptcy Case;

WHEREAS, subject to the terms and conditions of this Agreement, Seller desires to sell, and Purchaser desires to purchase, all of Seller's right, title, and interest in and to the Property;

WHEREAS, Seller and Purchaser also desire that Purchaser serve as the Stalking Horse Buyer for the Property pursuant to this Agreement, and thereby eligible for the Break-Up Fee as set forth herein; and

WHEREAS, the Seller and Purchaser further desire to effect the sale of the Property in furtherance of the Seller's confirmation of a liquidating plan of reorganization (the "Plan").

NOW, THEREFORE, the parties agree as follows:

1. **Defined Terms.** The terms set forth on Schedule B constitute defined terms in this Agreement, and, when used in this Agreement, they shall have the respective meanings set forth on Schedule B.

2. **Purchase and Sale of Assets.**

   2.1. On the Closing Date and following the entry of the Confirmation Order designating Purchaser as the highest and best bid for the Property, Seller shall sell, transfer and convey to Purchaser, and Purchaser shall purchase, acquire and receive from Seller, all of Seller's right, title and interest in and to the following:

      2.1.1. the property at 90 Nassau Street, New York, NY comprising the Land and all Improvements thereon (the "Property"); and

      2.1.2. the assumption and assignment of existing Leases for Tenants occupying the Property, together with all existing security deposits or credits thereafor.

   2.2. Notwithstanding anything to the contrary set forth in Section 2.1 or elsewhere in this Agreement, Seller is not selling or otherwise transferring to Purchaser any of, and Purchaser shall acquire no interest in or to, the following:

      2.2.1. all cash and cash equivalents, together with all pre-Closing Date rents and any accrued accounts receivables, which remain property of Seller's bankruptcy estate.

2.2.2. all books, records, files and papers (whether in hard copy or computer format) that are not used in, or that do not relate to or affect, the Property;

2.2.3. any insurance policies to which Seller is a party, except as expressly provided by this Agreement; and

2.2.4. any other personal property of Seller, wherever located, except those items located on the Property and used in the operation of the Property.

2.3. **Purchase Price.**

2.3.1. The Purchase Price for the Property shall be Ten Million Two Hundred Fifty Thousand and 00/100 Dollars ($10,250,000.00), payable as follows:

2.3.1.1. The Deposit in the amount of Six Hundred Thousand and 00/100 Dollars ($600,000.00) previously paid by Purchaser shall be transferred to the Debtor's counsel's IOLA account to be held in escrow as hereinafter provided without interest (the "Escrow").

2.3.1.2. The balance of Nine Million Six Hundred Fifty Thousand and 00/100 Dollars ($9,650,000.00) or such higher amount depending on the bidding, to be paid at the Closing by immediately available federal funds wired to the account designated by Seller or Seller's Attorneys prior to the Closing.

2.4. **No Further Due Diligence and No Finance Contingency.** All due diligence relating to the Property including environmental review and tenant and lease review, has been completed and no further due diligence is required by Purchaser or will be a condition to the sale. Additionally, this Agreement is not subject to a financing contingency of any kind and the Purchaser represents that Purchaser has the financial resources to close and consummate the sale transaction.

3. **State of Title.** Purchaser shall accept fee simple title to the Property, free and clear of all claims, liens and interests pursuant to 11 U.S.C. §§ 363 (b) and (f) and 1123 as applicable, except for the assignment of the existing mortgage pursuant to a CEMA in form satisfactory to the Seller's lender, but subject to the following (collectively, the "Permitted Encumbrances"):

3.1. All building, zoning and other restrictions, regulations, requirements, laws, ordinances, resolutions and orders of any state, municipal, federal or other governmental authority, including all boards, bureaus, commissions, departments and bodies thereof, now or hereafter having or acquiring jurisdiction over the Property or the use or improvement thereof.

3.2. Covenants, easements and restrictions of record as of the date hereof provided same does not prevent the current use and maintenance as presently constituted.

2

3.3. Any state of facts shown on the existing survey and any state of facts shown on any updated survey provided same does not render title unmarketable.

3.4. Rights of Tenants of the Property pursuant to Leases as itemized on the attached Schedule.

3.5. Rights, if any, relating to construction, maintenance and operation of public utility lines, wires, poles, cables, pipes, distribution boxes and other equipment and installations on, over and under the Property; provided, same does not impose a monetary obligation on the owner of the Property of more than $5,000.

3.6. Minor encroachments and projections of areas, cornices, trim, fences, hedges, retaining walls, awnings, canopies, ledges, or other improvements or installations from the Property onto any street or highway or onto adjoining property, and encroachments of similar elements projecting from adjoining property over the Property, provided the Title Company will affirmatively ensure that encroachments over adjoining property may remain as long as building stands.

3.7. Real estate taxes and related charges, if any, subject to adjustment as hereinafter provided.

3.8. Minor imperfections of title, if any, none of which is substantial in amount, materially detracts from the value or impairs the use of the Property and is of a nature that a recognized title company would not either insure over or provide affirmative coverage against such imperfection without additional premium.

3.9. Any other matter which the Title Company may raise as an exception to title, provided the Title Company will insure against collection or enforcement of same out of the Property without any special premium or endorsement.

4. **Objections to Title**

4.1. Upon being designated as the Stalking Horse Buyer, Purchaser shall order a title insurance commitment from the Title Company. All Title Reports and Title Updates shall be promptly furnished to Seller's Attorneys, Attention: Kevin J. Nash, Esq., 125 Park Avenue, 12th Floor, New York, NY 10017. Purchaser shall deliver to Seller's attorneys not later than the Title Objection Notification Date, a letter from Purchaser or Purchaser's attorneys setting forth any objections to title.

4.2. Purchaser shall accept fee simple title to the Property as the Title Company will insure in accordance with the Confirmation Order subject only to the Permitted Encumbrances and such other exceptions as the Title Company, without special premium, will omit as exceptions to coverage or will except with insurance against collection out of or enforcement against the Property.

4.3. If Seller is unable to convey title in accordance with this Agreement by the Closing Date, then Seller shall be entitled, at its election, to one (1) or more adjournments of the Closing

3

Date for a period not to extend beyond ~~July 29~~, 2021, and the Closing Date shall be [*handwritten: August 7*] adjourned to a date specified by Seller not beyond such period. If, at the expiration of said period or, if Seller shall be unable to convey title to the Property in accordance with this Agreement or if the Bankruptcy Court shall fail to approve the sale pursuant to the Plan, then, provided that Purchaser did not create or cause the condition preventing Seller to convey title in accordance with this Agreement, Seller's sole obligation shall be to cause the Escrow Agent to refund the Deposit to Purchaser, whereupon this Agreement shall terminate and neither party shall have any further rights or claims against the other, except for those obligations which expressly survive termination of this Agreement. If Purchaser creates or causes the condition that prevents Seller from conveying title in accordance with this Agreement, same shall constitute a default by Purchaser under this Agreement entitling Seller to exercise any and all remedies available to Seller set forth in this Agreement.

4.4. Notwithstanding the provisions in Section 4.3 to the contrary, Purchaser may, by notifying Seller at any time prior to the expiration of the period referred to in Section 4.3, if Seller elects to adjourn the Closing Date in accordance with Section 4.3, elect to accept such title as Seller can convey. In such event, such Encumbrances that Seller was unable to discharge or otherwise remove shall be deemed to be a Permitted Encumbrance and this Agreement shall remain in effect and the parties shall proceed to Closing and Purchaser shall remain obligated to purchase the Property for the full Purchase Price without any abatement, credit or allowance of any kind or any claim or right of action against Seller for Damages or otherwise for such Encumbrances.

4.5. Purchaser and Seller shall cooperate with the Title Company in connection with obtaining title insurance insuring title to the Property consistent with proceedings before the Bankruptcy Court and subject only to the Permitted Encumbrances. In furtherance and not in limitation of the foregoing, at or prior to the Closing, Purchaser and Seller shall deliver to the Title Company such affidavits, certificates and other instruments as are reasonably requested by such Title Company and customarily furnished in connection with the issuance of Owner's policies of title insurance.

5. **Violations.** Purchaser agrees to take title subject to all conditions giving rise to Violations, except that any monetary charges, fines or penalties associated with the Violations shall be addressed in the Seller's bankruptcy case and paid in connection with the Seller's Plan without additional payment by Purchaser beyond the Purchase Price. To the extent available, Seller shall provide to Purchaser copies of all Post-Agreement Violations. If required, Seller, upon written request by Purchaser, shall furnish to Purchaser written authorization to make necessary searches to determine whether Violations have been noted or issued with respect to the Property.

6. **Litigation.** Purchaser acknowledges that Seller is subject to a pending Chapter 11 case and this Agreement remains subject to Bankruptcy Court Approval. Accordingly, Purchaser's obligations under this Agreement shall not be affected by (i) the pendency of any of the litigation involving the Seller; or (ii) any other litigation affecting the Property whether commenced prior to or subsequent to the date hereof, provided that such litigation does not

4

have a material adverse effect on the transaction contemplated by this Agreement and cannot be otherwise addressed by the Bankruptcy Court. Additionally, the execution of this Agreement as a Stalking Horse Contract shall constitute a full and final settlement and resolution of the Seller's pending motion to deem the pre-petition contract with New Aim Realty LLC ("New Aim") terminated or rejected. By agreement, the pre-petition contract is of no further force and effect and is hereby superseded by this Agreement made by affiliates of New Aim. Accordingly, New Aim shall have no claims or rights against the Seller or the Seller's bankruptcy estate for any damages arising out of the pre-petition contract, with the deposit of $600,000 to be transferred to the Seller's bankruptcy counsel to remain as the Deposit.

7. **Free and Clear Sale of Property**. *Judgments* At Closing Seller shall deliver title to the Property free and clear of all liens, taxes, claims and interests (except for Permitted Encumbrances), excluding the assumed and assigned pre-petition contract.

8. **Closing Date**.

   8.1. The Closing or Closing Date shall occur no later than July 30, *August 7,* 2025, time of the essence. The Closing shall be held at the offices of Seller's Attorneys, 125 Park Avenue 12th Floor, New York, New York 10017 or remotely in care of the Title Company.

9. **Closing Documents**.

   9.1. Seller shall deliver to Purchaser (duly executed where appropriate) at the Closing:

      9.1.1. Possession of the Property;

      9.1.2. a certificate evidencing that Seller is not a "foreign person" within the meaning of the Internal Revenue Code of 1986, as amended;

      9.1.3. a Bargain and Sale deed with covenants as to the Property;

      9.1.4. an assignment and assumption agreement (the "Assignment of Leases"), whereby Seller assigns its interest under the Leases and any unapplied security deposits to Purchaser and Purchaser assumes all of Seller's obligations under the Leases and the Security Deposits, which first accrue, arise and are performable on or after Closing;

      9.1.5. a copy of a notice, which will be delivered to each of the Tenants under the Leases to inform the Tenants of Purchaser's acquisition of the Property and to direct that future rents post-Closing Date due under such Leases be paid to Purchaser, with all pre-closing rents to be paid to the Seller;

      9.1.6. the Confirmation Order; and

      9.1.7. any other documents required by this Agreement, or reasonably requested by the Title Company to be delivered by Seller.

5

9.2. Purchaser shall deliver to Seller (duly executed where appropriate) at the Closing:

    9.2.1.  the Purchase Price in accordance with Section 2.3 hereof, plus or minus prorations and adjustments provided for in this Agreement;

    9.2.2.  an executed counterpart to the Assignment and Assumption of Leases;

    9.2.3.  copy of the Formation Documents (i.e., Articles of Organization, Certificate of Incorporation, etc.) and the authorization or resolution of Purchaser approving the transactions described in this Agreement; and

    9.2.4.  any other documents required by this Agreement, or reasonably required by the Title Company to be delivered by Purchaser.

10. **Adjustments and Costs.** Unless otherwise provided below, the following are to be adjusted and prorated between Seller and Purchaser as of the Effective Time, based upon a 365-day year, and the net amount thereof shall be added to (if such net amount is in favor of Seller,) or deducted from (if such net amount is in Purchaser's favor) the Purchase Price payable at Closing:

    10.1.    Real estate Taxes and related charges for water and all public utilities, if any, on the basis of the fiscal period for which assessed. If on the Closing Date the Tax rate shall not have been fixed, the apportionment shall be based upon the Tax rate for the preceding year applied to the latest assessed valuation; however, adjustment will be made when the actual Tax amount is determined; and

    10.2.    The amount of any unpaid real estate Taxes, assessments, water and public utility charges which Seller is obligated hereunder to discharge or satisfy, with any interest or penalties thereon, at the option of Seller, may be allowed as a credit to Purchaser at the Closing, provided official bills therefore are furnished at the Closing. If on the Closing Date there are any mortgage liens or Encumbrances which Seller is obligated hereunder to discharge or satisfy, Seller may use any portion of the Purchase Price to discharge or satisfy the same, or may deposit with the Title Company an amount sufficient to discharge or satisfy the same, provided that, upon such deposit, the Title Company "omits" same from Purchaser's title report and policy. The existence of liens, Encumbrances, real estate Taxes, assessments or water charges shall not be an objection to title, provided Seller shall comply with the provisions of this Section.

    10.3.    Rents payable by Tenants, which are paid on or prior to the Closing Date in respect of the Closing Month, on a per diem basis, based upon the number of days in the Closing Month prior to the Closing Date (which shall be allocated to Seller) and the number of days in the Closing Month on and after the Closing Date (which shall be allocated to Purchaser).

10.3.1. If, at the Closing Date, rent is past due by any Tenant, Purchaser agrees that the first moneys received by Purchaser from such Tenant shall be received and held by Purchaser in trust, and shall be disbursed as follows:

10.3.1.1. First, to Seller and Purchaser in an amount equal to their proportionate share of such rents owing by such Tenant in respect of the Closing Month;

10.3.1.2. Next, to Purchaser, in an amount equal to all rent owing by such Tenant to Purchaser in respect of all periods after the Closing Month;

10.3.1.3. Next, to Seller, in an amount equal to all rent owing by such Tenant to Seller in respect of all periods prior to the Closing Month; and

10.3.1.4. The balance, if any, to Purchaser.

10.3.2. Each party agrees to remit reasonably promptly to the other the amount of such rents to which such party is so entitled and to account to the other party monthly in respect of same. Seller shall have the right from time to time for a period of one hundred eighty (180) days following the Closing, on reasonable prior notice to Purchaser, to review Purchaser's rental records with respect to the Premises to ascertain the accuracy of such accountings. Purchaser shall have the right from time to time for a period of one hundred eighty (180) days following the Closing, on reasonable prior notice to Seller, to review Seller's rental records with respect to the Premises to ascertain the accuracy of such accountings. The rent received by Seller after the Closing shall be apportioned and remitted, if applicable, as hereinabove provided.

10.3.3. All security deposits and advance rentals in the nature of security deposits due under Leases or made by Tenants under Leases, if any, shall be turned over or credited to Purchaser at the Closing.

10.3.4. Subsequent to the Closing Date, Purchaser agrees that for a period of six (6) months, it shall promptly render bills, in the course of its ordinary practice, for the collection of any rent due to Seller pursuant to this Agreement. Purchaser's obligation to pay over to Seller rents collected as provided in Section 10.3.1 shall be an independent covenant of Purchaser and such payments shall be made promptly without any set off or deduction whatsoever, other than legal fees incurred in connection therewith. Following the Closing, Seller may not assert separate and independent claims against Tenants owing rent to which Seller is entitled hereunder.

10.3.5. Purchaser shall pay all expenses for examination of title, the premium for any title insurance policy issued to Purchaser, and all other title, survey or other expenses incurred by Purchaser in connection with this Agreement or the closing of title hereunder.

10.3.6. To the extent not exempt pursuant to Section 1146 of the Bankruptcy Code, the Seller shall pay all transfer taxes owed in connection with the sale of the Property. Seller and Purchaser agree to execute, swear to, and cause to be filed any applicable transfer tax returns or other returns required in connection with the Closing.

10.3.7. Seller and Purchaser each shall pay their own attorneys' fees in connection with this Agreement and the closing of title.

## 11. Bankruptcy Matters.

11.1.    This Agreement is subject to approval of the Bankruptcy Court pursuant to Sections 363(b) and (f) and 1123 as applicable.

11.2.    **Bankruptcy Court Approval.** Seller and Purchaser shall use commercially reasonable efforts to obtain approval of this Agreement as the Stalking Horse Contract for the Property in advance of the auction sale currently scheduled for June 18, 2025. Purchaser agrees that it will take commercially reasonable actions as requested by Seller to assist in obtaining entry of an Order approving this Agreement as the Stalking Horse Contract, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. If this Agreement is not approved as the Stalking Horse Contract for any reason, then the Purchaser may still bid at the Auction in accordance with the Bidding Procedures, with the prior pre-petition contract with New Aim continued to be deemed of no further force and effect under any circumstances, without any claims against the Seller or the Seller's bankruptcy estate arising thereunder.

11.3.    **Overbid Procedures.** Seller and Purchaser acknowledge that this Agreement and the Sale of the Property are subject to Bankruptcy Court Approval. Purchaser and Seller acknowledge that Seller must take reasonable steps to demonstrate that it has sought to obtain the highest or otherwise best price for the Property, including publication of the Auction in the New York Times, giving notice thereof to the creditors of Seller and other interested parties, providing information about the Property to prospective bidders and entertaining higher and better offers from such prospective bidders in accordance with the Bid Procedures set forth in the Bid Procedures Order. Purchaser agrees and acknowledges that Seller is and may continue soliciting inquiries, proposals or offers for the Property in connection with any alternative transaction pursuant to the terms of the Bid Procedures Order, and agrees and acknowledges that the Bid Procedures may be supplemented by other customary procedures not inconsistent with the matters otherwise set forth therein and the terms of this Agreement. The Bid Procedures shall establish that no bids shall be considered a "qualified bid" unless the total consideration of such bid shall be in an amount that is at least equal to the Break-Up Fee of $250,000 plus the total consideration contemplated under this Agreement plus an incremental amount of at least $100,000, or $10.6 million, it being understood that $10.6 million shall be solicited at the auction as the next highest bid. If Purchaser is not the prevailing bidder but is the next highest bidder

8

for the Property, Purchaser may, in its sole discretion, serve as a back-up bidder (the "Back-Up Bidder") and keep Purchaser's bid to purchase the Property on the terms and conditions set forth in this Agreement open and irrevocable, notwithstanding any right of Purchaser to otherwise terminate this Agreement pursuant to the terms hereof. Following the Confirmation and Sale Hearing, if the prevailing bidder fails to consummate the Sale as a result of a breach or failure to perform on the part of such prevailing bidder and the purchase agreement with such prevailing bidder is terminated, Purchaser, as the Back-Up Bidder (if such right is to exercised by Purchaser), will be deemed to have the new prevailing bid, and Seller will be authorized (subject to approval of the Bankruptcy Court in the Bid Procedures Order) to consummate the Sale on the terms and conditions set forth in this Agreement with Purchaser, as the Back-up Bidder, so long as Purchaser has not previously terminated this Agreement in accordance with its terms. Seller and Purchaser agree that the provisions of this Agreement, including this Section 11.3 and Section 11.4, are reasonable, were a material inducement to Purchaser to enter into this Agreement and are designed to achieve the highest and best price for the Property.

11.4.    **Stalking Horse Bid Protections.** Seller acknowledges that (i) Purchaser has made a substantial investment of management time and incurred substantial out-of-pocket expenses in connection with the pre-petition contract of New Alm and the subsequent negotiation and execution of this Agreement, its due diligence regarding the Property and Seller in its effort to consummate the Sale and (ii) Purchaser's efforts have substantially benefitted Seller and will benefit its bankruptcy estate through the submission of the offer that is reflected in this Agreement that will serve as the minimum bid as to which other potential bidders may rely, thus increasing the likelihood that the price at which the Property is sold. Therefore, in consideration thereof, and as compensation for the value provided to Seller and the bankruptcy estate, Seller agrees to a break-up fee in the sum of $250,000 (the "Break-Up Fee") to be paid if an alternate Third-Party Sale is consummated for a purchase price of $10.6 million or more. If the Break-Up Fee becomes payable as set forth herein, such Break-Up Fee shall be made by wire transfer of immediately available funds to an account designated by Purchaser, and such payment shall be made on or before the third (3rd) Business Day following the consummation of such Third-Party Sale. For the avoidance of doubt, (i) no Break-Up Fee shall be payable, and Purchaser shall not seek payment of any Break-Up Fee, prior to consummation of a Third-Party Sale and (ii) in no event shall Seller be obligated to pay the Break-Up Fee on more than one occasion. Each of Purchaser and Seller acknowledges and agrees that: (i) the agreements contained in this Section 11.4 are an integral part of this Agreement; (ii) the Break-Up Fee is reasonable and is not a penalty, but rather is liquidated damages in a reasonable amount that will reasonably compensate Purchaser in the circumstances in which such Break-Up Fee is payable for the efforts and resources expended and opportunities foregone by Purchaser while negotiating and pursuing the Sale and this Agreement.

12. **Conditions Precedent to Purchaser's Obligation to Close.**  Purchaser's obligation to consummate the transactions described in this Agreement is subject to the satisfaction, at or prior to such Closing Date, of each of the following conditions (any of which may be waived by Purchaser, in whole or in part):

9

12.1.   Seller has performed or complied in all material respects with all of the covenants and obligations required of Seller by this Agreement.

12.2.   Bankruptcy Court Approval of this Agreement as the highest and best offer (as it may be increased) has been obtained pursuant to the Confirmed Order.

12.3.   Units 5 and 6 at the Property shall remain vacant and no existing leases will be extended or modified pending Closing.

12.4.   Seller shall use all commercially reasonable efforts to cause the current lender to assign its existing mortgages to Purchaser's lender without recourse or representation for CEMC purposes and without additional cost, or, alternatively, Seller shall attempt to obtain an exemption of mortgage recording taxes for Purchaser's lender.

13. **Conditions Precedent to Seller's Obligation to Close.** Seller's obligation to consummate the transactions described in this Agreement, and to take the actions required to be taken by Seller at the Closing, is subject to the satisfaction, at or prior to such Closing, of each of the following conditions (any of which may be waived by Seller, in whole or in part):

13.1.   Purchaser has performed or complied with all of the covenants and obligations required of Purchaser by this Agreement.

13.2.   Bankruptcy Court Approval of this Agreement as the highest and best offer (as it may be increased) has been obtained pursuant to the Confirmed Order.

14. **Default.** Provided Seller has obtained Bankruptcy Court approval of this Agreement and is otherwise ready, willing and able to close as provided herein and if the Purchaser shall fail to close the transaction contemplated hereby as and when required, the Deposit shall be paid over to Seller as agreed liquidated damages (as Seller's sole remedy and Purchaser's sole obligation), it being acknowledged that in such event of a Purchaser default, Seller will suffer substantial damages but such damages are incapable of exact ascertainment. After release to Seller of the Deposit, neither party shall have any further rights or obligations hereunder except with respect to the provisions hereof which specifically survive termination. If Seller shall fail to close the transaction contemplated hereby as and when required, Purchaser shall have its rights to seek specific performance before the Bankruptcy Court, which shall be Purchaser's sole remedy.

15. **Escrow Conditions.**

15.1.   In connection with this Agreement, Purchaser has caused the transfer of the Deposit on the timeframe set forth above by immediately available federal funds to Escrow Agent, 125 Park Avenue, 12th Floor, New York, New York 10017.

15.2.   Escrow Agent shall hold the Deposit in its IOLA Account without interest in accordance with this Agreement. Escrow Agent hereby is authorized and directed to deliver the Deposit to Seller if, as and when title closes. If Escrow Agent shall receive an

10

instruction from Seller or Purchaser as to the Deposit, Escrow Agent shall act in accordance with such instruction if the other party shall fail to notify Escrow Agent not to act in accordance with such instruction within ten (10) Business Days after delivery of such instruction by Escrow Agent to said other party. Escrow Agent at any time may deposit the Deposit with a court of competent jurisdiction, and, upon notice to Seller and Purchaser of such deposit, Escrow Agent shall have no further responsibility or liability hereunder. Escrow Agent shall act upon any instruction or other writing believed by Escrow Agent in good faith to be genuine and to be signed or presented by the proper persons.

15.3. Purchaser acknowledges that Escrow Agent is, pursuant to an Order of the Bankruptcy Court, attorney-in-fact to the Seller and has participated in the negotiations of the provisions of this Agreement. Seller and Purchaser acknowledge that Escrow Agent is merely a stakeholder, and that Escrow Agent shall not be liable for any act or omission unless taken or suffered in bad faith, in willful disregard of this Agreement or involving gross negligence. Seller and Purchaser shall jointly and severally indemnify and hold Escrow Agent harmless from and against any reasonable costs and reasonable expenses actually incurred in connection with the proper performance of the Escrow Agent's duties hereunder. If a dispute arises as to the holding of the Deposit, Seller and Purchaser shall be jointly and severally liable for, and shall pay Escrow Agent, any reasonable costs of Escrow Agent actually incurred in connection therewith. Notwithstanding that Escrow Agent is serving as the Escrow Agent pursuant to this Article, Escrow Agent as attorneys may represent Seller in the event of any dispute hereunder.

15.4. All instructions or notices given pursuant to this Article shall be in writing and delivered in accordance with the requirements for notices pursuant to this Agreement. For purposes of this Article, such instructions and notices shall be deemed delivered on the date of delivery, if by hand, or on the date of mailing in accordance with Article 18 if mailed, except that no instruction or notice to Escrow Agent shall be deemed effectively delivered to Escrow Agent until actual receipt thereof by Escrow Agent. This Article may not be amended without the prior written Consent of Escrow Agent.

16. **Brokerage**. Each party represents and warrants to the other that they have not dealt with any broker in connection with this post-petition sale with the claims, if any, of the pre-petition broker (ILAL) to be addressed by the Bankruptcy Court. Each party agrees to indemnify and hold the other harmless from and against any and all liability, claim, loss, damage or expense, including reasonable attorneys' fees in connection with any other broker. The provisions of this Article shall survive the Closing.

17. **Notices**. In order for the same to be effective, each and every notice, communication, request or demand permitted or required to be given by the terms and provisions of this Agreement, or by any law or ordinance shall be given in writing, in the manner provided in this Section 17 unless expressly provided otherwise elsewhere in this Agreement.

17.1. In the case of notices given by Seller to Purchaser, any such notice shall be addressed to Purchaser at its address as stated on the first page of this Agreement, with a

11

copy to its attorneys, Attn: Walter Edelstein, Esq., (212) 759-1200; walter@edelsteinlawpc.com.

17.2.     In the case of notices given by Purchaser to Seller, any such notice shall be addressed to Seller at its address as stated on the first page of this Agreement, and a copy to Seller's Attorneys, Attn: Kevin J. Nash, Esq., (212) 311-6944; knash@gwfglaw.com.

17.3     Each party hereby authorizes its attorney named above or any successor attorney or managing agent designated by such party to give and receive any notice on its behalf.

17.4.     Notices may be given by telecopy, overnight courier with receipted delivery, or by any other manual or electronic means, or by hand delivery. Notices so given shall be deemed served and given on the date of receipt if received before 5:00 P.M. on a Business Day, or on the first Business Day following receipt if it is received at any other time.

17.5.     Either party may, by notice as aforesaid, designate one or more different parties and addresses for notices in lieu of those specified above. Such designation shall be valid only when notice of such designation is given in the manner required herein.

18. **Representations, Warranties and Covenants of Seller.** Purchaser represents, warrants and covenants to Seller that the sale shall be on "as is, whereas" basis based upon the following acknowledgments:

18.1.     Except as otherwise expressly stated in this Agreement, Seller makes no representation and warranty as to the Condition of the Property, the operations of the Property or the market conditions of the area in which the Property is located and is conveying possession of the Property to Purchaser AS IS, WHERE IS AND WITH ALL FAULTS as of the date of this Agreement, reasonable wear and tear, natural deterioration and damage by casualty excepted, and without representation or warranty of any kind or nature whether express or implied or arising by operation of law. Seller specifically disclaims any warranty of merchantability or fitness for a particular purpose. No adverse change in the Condition of the Property prior to the Closing Date shall give rise to any obligation on the part of Seller or remedy on the part of Purchaser, subject to Section 23 of this Agreement. Additionally, Seller makes no representations whatsoever concerning the Purchaser's ability to develop or build at the Property, and Purchaser has made an independent evaluation regarding the future use or development of the Property. The due diligence material provided by Seller to Purchaser is informational and Seller makes no representations regarding the accuracy or completeness of such material.

18.2.     Without limiting the generality of the foregoing, except for the representations and warranties of Seller contained in this Agreement, the transactions described in this Agreement are without statutory, express or implied warranty, representation, agreement, statement or expression of any opinion regarding the Condition of the Property, including any and all statutory, express or implied representations or warranties related to their suitability for habitability, merchantability, or fitness for a particular purpose or created

12

by any affirmation of fact or promise, by any description of the Property or by operation of any legal requirements.

19. **Representations, Warranties and Covenants of Purchaser.** Purchaser represents, warrants and covenants to Seller (which representations, warranties and covenants shall not survive the Closing unless expressly provided otherwise herein) as follows:

19.1.   Purchaser is or will be a corporation or limited liability company, duly organized and existing under the applicable laws of the State of its formation. The Purchaser has the legal power, right and authority to enter into this Agreement and the instruments referenced herein and to consummate the transaction contemplated hereby.

19.2.   Purchaser has the power and authority to execute, deliver and perform this Agreement, and has taken all actions required to authorize, execute, deliver and perform this Agreement, including approval by the officers, directors or members of Purchaser. No Consent of filing with any Governmental Body is required for Purchaser to execute this Agreement and perform the transactions described in this Agreement by the Purchaser. The execution and delivery of this Agreement by Purchaser does not violate any provisions of the organizational documents of Purchaser and will not result in a Breach or violation or default under any Order or governmental authorization to which Purchaser is subject or result in a Breach by Purchaser under any contract to which it is bound. Neither the execution and the delivery of this Agreement nor Purchaser's compliance with the terms of this Agreement will (a) violate any legal requirements applicable to Purchaser, or (b) require the Consent or the making by Purchaser of any declaration, filing or registration with any person.

19.3.   In entering into this Agreement, Purchaser hereby represents to Seller that it has financial wherewithal to pay the balance of the purchase price without a financing contingency. Purchaser's obligations under this Agreement shall not be subject to any other contingencies, additional diligence or conditions. Purchaser represents that it has expertise in financial and business matters that enable Purchaser to evaluate the merits and risks of the transactions described in this Agreement.

19.4.   All of the Purchaser's representations, warranties and covenants set forth in this Agreement shall be deemed made by Purchaser to Seller as of the date of this Agreement and as of the Closing Date.

20. **No Assignment.** This Agreement may not be assigned by Purchaser without the prior written consent of Seller, which may be given or denied in Seller's sole discretion. Any agreement by Purchaser to assign or transfer this Agreement shall be deemed to constitute an "assignment" of this Agreement for purposes of this Article. Any breach by Purchaser of the provisions of this Section 20 shall constitute a default by Purchaser under the terms of this Agreement, entitling Seller to exercise any and all remedies available to Seller under this Agreement. Notwithstanding the foregoing, Purchaser may assign this Agreement to an entity to be formed provided such assignment takes effect at Closing and Seller receives its full considerations hereunder.

13

21. **Purchase Price, Costs and Sales Taxes.** Purchaser agrees to (i) pay any sales, use and similar Tax payable with respect to any personal property transferred in connection with the Property and to indemnify and hold harmless Seller from and against any and all liability, loss, cost, damage and expense (including, but not limited to, interest, penalties and attorneys' fees) which Seller may sustain by reason of the non-payment of such Tax and (ii) file any sales, use or other Tax reports which may be required. Purchaser shall pay (a) the cost of the Survey, (b) the cost of premiums on the Title Policy, (c) the cost of having performed any due diligence, (d) the cost of any recordation fees to put the Deed of record with the appropriate Governmental Body, (e) all costs and expenses of obtaining any financing Purchaser may elect to obtain, including, but not limited to, any fees, financing costs, mortgage and recordation Taxes and intangible Taxes in connection therewith, and (f) the cost of its legal counsel, advisors and other professionals employed by Purchaser in connection with its purchase of the Property from Seller. Seller shall pay the cost of (a) its legal counsel, advisors and other professionals employed by Seller in connection with the sale of the Property to Purchaser, and (b) recordation fees, transfer taxes (unless exempt) and other expenses related to the discharge of any Encumbrance on the Property that is not a Permitted Encumbrance.

22. **Potential Transfer Tax Exemption.** The Confirmation Order shall provide that the transfer of the Property shall be exempt from payment of all transfer, mortgage (as applicable) and recording taxes otherwise owed to a local, state or federal government unit, and shall provide that the recorder of deeds or similar official of a local, state or federal government unit in which the instrument contemplated by the sale be recorded, shall accept such instrument for recording without requiring the payment of any filing fees documentary stamp taxes or transfer taxes.

23. **Risk of Loss.**

   23.1     If, on or before the Closing Date, all or any of the Property are (i) materially damaged or destroyed by fire or other casualty or (ii) taken as a result of any condemnation or eminent domain proceeding, Seller shall promptly notify the Purchaser. If the resulting casualty or condemnation would cause a diminution in value of the Land or Buildings of more than the Threshold, taken in the aggregate, Purchaser may terminate this Agreement by delivery of notice of termination to the other within twenty (20) days after the date of such casualty or condemnation, **TIME BEING OF THE ESSENCE**. If Purchaser does not terminate this Agreement prior to the expiration of such twenty (20) day period, or such casualty or condemnation does not cause a diminution in value of the Land and Buildings of more than the Threshold of $1,000,000, taken in the aggregate, Purchaser shall remain obligated to close the acquisition of the Property without reduction in the purchase price.

   23.2     At the Closing, Seller shall credit against the Purchase Price payable by Purchaser an amount equal to the net proceeds, if any, received by Seller from such casualty and Seller shall be responsible to pay the applicable deductible under the subject insurance policy. If, as of the Closing Date, Purchaser has not elected to terminate this Agreement pursuant to Section 23.1 above, and Seller has not received any such insurance proceeds, then the parties shall, nevertheless, consummate the transactions described in this

14

Agreement on the Closing Date, without any deduction for such insurance proceeds, and Seller shall, at the Closing, assign to Purchaser all Seller's rights, if any, to the insurance proceeds and to all other rights or claims arising out of or in connection with such casualty and Seller shall, at Closing, pay, or credit to Purchaser, the applicable deductible.

24. **Miscellaneous.**

24.1.    All oral or written statements, representations, promises, and agreements of Seller and Purchaser are merged into and superseded by this Agreement, which alone fully and completely expresses their agreement, and this Agreement contains all of the terms agreed upon by the parties with respect to the subject matter hereof. This Agreement has been entered into after full investigation.

24.2.    None of the representations, warranties, covenants, or other obligations of parties hereunder shall survive the Closing, except as expressly provided herein.

24.3.    This Agreement may not be altered, amended, changed, waived, or modified in any respect or particular unless the same shall be in writing signed by Seller and Purchaser. No waiver by any party of any breach hereunder shall be deemed a waiver of any other or subsequent breach.

24.4.    Neither this Agreement nor any memorandum thereof shall be recorded by Purchaser. Any recordation or attempted recordation by Purchaser of same shall be a material default by Purchaser hereunder.

24.5.    This Agreement shall not be considered an offer or an acceptance of an offer by Seller, and shall not be binding upon Seller until executed and approved by the Bankruptcy Court.

24.6.    This Agreement may be executed by facsimile or electronically and in any number of counterparts, all of which taken together shall constitute one and the same instrument.

24.7.    Section titles or captions in this Agreement are included for purposes of convenience only and shall not be considered a part of the Agreement in construing or interpreting any of its provisions. All references in this Agreement to Sections shall refer to Sections of this Agreement unless the context clearly otherwise requires.

24.8.    The parties have participated jointly in the negotiation and drafting of this Agreement. If any ambiguity or question of intent or interpretation arises, no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

24.9.    Unless the context otherwise requires, when used in this Agreement, the singular shall include the plural, the plural shall include the singular, and all pronouns shall be deemed to refer to the masculine, feminine or neuter, in the identity of the person or persons may require.

15

24.10. The parties do not intend that this Agreement shall confer on any third party any right, remedy or benefit or that any third party shall have any right to enforce any provision of this Agreement.

24.11. Any dispute, claim or action arising in connection with this Agreement shall be adjudicated by the Bankruptcy Court.

24.12. This Agreement shall be governed by, and shall be construed and enforced in accordance with, the laws of the State of New York where the parties maintain business offices and the Bankruptcy Code, as applicable, without giving effect to any conflict of law rule or principle of such state.

24.13. Neither Seller nor Purchaser nor any of their constituents have engaged in any dealings or transactions, directly or indirectly, (a) in contravention of any U.S., international or other money laundering regulations or conventions, including, without limitation, the United States Bank Secrecy Act, the United States Money Laundering Control Act of 1986, the United States International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001, Trading with the Enemy Act (50 U.S. C. §1 et seq., as amended), or any foreign asset control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto, or (b) in contravention of the Anti-Terrorism Order, or on behalf of terrorists or terrorist organizations, including those persons or entities that are included on any relevant lists maintained by the United Nations, North Atlantic Treaty Organization, Organization of Economic Cooperation and Development, Financial Action Task Force, U.S. Office of Foreign Assets Control, U.S. Securities & Exchange Commission, U.S. Federal Bureau of Investigation, U.S. Central Intelligence Agency, U.S. Internal Revenue Service, or any country or organization, all as may be amended from time to time. Neither Seller nor Purchaser nor any of their constituents (i) are or will be conducting any business or engaging in any transaction with any person appearing on the U.S. Treasury Department's Office of Foreign Assets Control list of restrictions and prohibited persons, or (ii) are a person described in section 1 of the Anti-Terrorism Order, and to the best of each party's knowledge, neither Seller nor Purchaser nor any of their Affiliates have engaged in any dealings or transactions, or otherwise been associated with any such person.

24.14. **Counterparts; Electronic Signatures.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument. Signatures delivered by electronic transmission (including by email in PDF format or via electronic signature platforms such as DocuSign) shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[Signature page follows]

16

IN WITNESS WHEREOF, Seller and Purchaser have duly executed this Agreement on the date first above written.

SELLER:

BANKRUPTCY ESTATE OF
59 NASSAU STREET LLC, a
New York limited liability company

By: _____
Name:
Title:

PURCHASER:

BERNART CAPITAL LLC, a
Delaware limited liability company

By: _____
Name: Ira Lifshutz
Title: President

ESCROW AGENT:

GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP hereby executes this Agreement for the sole purpose of agreeing to serve as Escrow Agent in accordance with the provisions of Section 15 of this Agreement.

GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP

By: _____
    Kevin J. Nash, Esq.

New Aim Realty LLC
As to the termination of the contract and the release of claims

By: _____
    Name: Ira Lifshutz
    Title: President

[Signature page to Purchase and Sale Agreement]

"**Agreement**" means this Purchase and Sale Agreement.

"**Anti-Terrorism Order**" means Executive Order No. 13224 dated September 24, 2001 issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with persons Who Commit, Threaten to Commit, or Support Terrorism), as may be amended or supplemented from time to time.

"**Assignment of Leases**" means an assignment and assumption agreement in the form reasonably acceptable to the parties, whereby Seller assigns its interest under the Leases and any unapplied security deposits to Purchaser and Purchaser assumes all of Seller's obligations under the Leases and the security deposits, which first accrue, arise and are performable on or after Closing.

"**Back-Up Bidder**" means Purchaser if Purchaser is the next highest bidder for the Property.

"**Bankruptcy Case**" means Seller's pending Chapter 11 case in the Bankruptcy Court.

"**Bankruptcy Court**" means the United States Bankruptcy Court, Eastern District of New York.

"**Bid Procedures**" means, collectively, the bid procedures previously approved on May 29, 2025.

"**Business Day**" means any day other than Saturdays, Sundays, all days observed by the federal or New York state government as legal holidays and all days on which commercial banks in the State of New York or the State of New York are required to be closed. If any time period expires on a Saturday, Sunday, or a legal holiday of the State of New York, the date of performance shall be the next day which is not a Saturday, Sunday, or legal holiday.

"**Closing**" means the closing of the transaction contemplated hereunder.

"**Closing Month**" means the month (or other applicable collection period) in which the Closing occurs.

"**Condition of the Property**" means, collectively:

    i. the quality, nature and adequacy of the physical Condition of the Property, including (A) the quality of the design, labor and materials used to construct the improvements included in the Property or in the construction of the Property; (B) condition of structural elements, foundations, roofs, glass, mechanical, sewer, plumbing, electrical, HVAC and utility components and systems; (C) the capacity or availability of sewer, water, telecommunications or other utilities; (D) the geology, flora, fauna, soils, subsurface conditions, groundwater, landscaping and irrigation of the Property, and its location in or near any special taxing district, flood hazard zone, wetlands area, protected habitat, geological fault or subsidence zone, hazardous waste disposal or clean-up site, or other special area; (E) the existence, location or condition of ingress, egress, access and parking; (F) the condition of any fixtures; the presence of any asbestos or other Hazardous

Materials, dangerous, or toxic substance, material or waste in, on, under or about the Property thereon; (G) any environmental, botanical, zoological, hydrological, geological, meteorological, structural or other condition or hazard or the absence thereof heretofore, now or hereafter affecting in any manner the Property; (H) the development of Property; and (I) any other matter or thing related to the Property;

ii.   the economic feasibility, cash flow and expenses of the Property, and habitability, merchantability, fitness, suitability and adequacy of the Property for its current use and purpose, and any condition at or which affects the Property with respect to a particular use, purpose, development, potential or otherwise;

iii.   the compliance or failure to comply by Seller with (A) all legal requirements or Governmental Authorizations, including those relating to zoning, building, public works, parking, fire and police access, handicap access, life safety, subdivision and subdivision sales, and (B) all agreements, covenants, conditions, restrictions (public or private), development agreements, site plans, building Permits, building rules and other instruments and documents governing or affecting the use, management and operation of the Land or Buildings;

iv.   those matters referred to in this Agreement; and

v.   the availability, cost, terms and coverage of liability, hazard, terrorism, comprehensive and any other insurance for the Property or its operations.

"**Confirmation Order**" means the order (together with any findings of fact and conclusions of law) entered by the Bankruptcy Court approving the sale of the Purchaser and the transfer of the Property to Purchaser in accordance with the provisions of this Agreement, free and clear of all liens, taxes, claims and interests pursuant to applicable provisions of the Bankruptcy Code.

"**Deposit**" shall mean the sum of Six Hundred Thousand and 00/00 Dollars ($600,000.00).

"**Effective Time**" means 12:01 A.M. (EST) on the Closing Date.

"**Encumbrance**" means, collectively, any charge, claim, condition, equitable interest, lien, option, pledge, security interest, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"**Environmental Claims**" means, collectively, any assertion by any person of a cause of action with respect to the Property in connection with the presence of any Hazardous Materials or violation of any Environmental Law, whether or not reduced to a judgment.

"**Environmental Law**" means, collectively, all Legal Requirements and all contractual obligations concerning public health and safety, employee health and safety, and pollution or protection of the environment, (including indoor or outdoor air, surface water, groundwater, land surface or subsurface) or the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release,

[Schedule B, page ii]

control, management, remediation or abatement of any Hazardous Materials, each as amended and as now or hereafter in effect.

"Governmental Authorizations" means, collectively, all permits, licenses, approvals, certificates, consents, authorizations, variances, registrations, exemptions, and other similar rights or orders issued or granted by any Governmental Body having jurisdiction over the Property or any portion thereof, including, without limitation, certificates of occupancy, building permits, zoning approvals, environmental permits, and any other approvals required for the ownership, occupancy, use, operation, leasing, or development of the Property.

"Governmental Body" means, collectively, any (a) nation, state, county, city, town, village, district, or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign, or other government; (c) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or Entity and any court or other tribunal); (d) multi-national organization or body; or (e) body exercising or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or Taxing authority or power of any nature.

"Hazardous Materials" means, collectively, any waste or other substance that is listed, defined, designated, or classified as, or otherwise determined to be, hazardous, radioactive, or toxic or a pollutant or a contaminant under or pursuant to any Environmental Law, including any mixture or solution thereof, and specifically including petroleum and all derivatives thereof or synthetic substitutes therefore and asbestos or asbestos-containing materials.

"Improvements" means, collectively, any and all buildings, structures, fixtures, and other improvements now or hereafter erected on the Land, including, but not limited to, any existing buildings.

"Land" means that certain real property designated as Block 78, Lot 43 in the City, County and State of New York, and as more particularly described on Schedule A attached hereto and made a part hereof (collectively, and together with all development and other rights appurtenant thereto).

"Leases" means, collectively, leases with Seller or any predecessor fee owner of the Property as listed on the schedule attached hereto.

"Permitted Encumbrances" are the exceptions to title set forth in Section 3 of the Agreement.

"Rents" means, collectively, all rents and other sums receivable from Tenants pursuant to Leases.

"Sale" means the sale by Purchaser of the Property.

"Taxes" means, collectively, any and all general real estate taxes, special assessments, building improvement district (BID) assessments, and personal property taxes.

"Third Party" means a person other than Purchaser or an affiliate of Purchaser.

"Third-Party Sale" means a sale of the Property to a Third Party.

"**Threshold**" means the sum of One Million and 00/100 Dollars ($1,000,000.00).

"**Violations**" means, collectively, all notes or notices of violations of law or governmental ordinances, orders or requirements issued by any governmental department, agency or bureau having jurisdiction as to conditions affecting the Property issued prior to the Closing Date.

RIDER TO BE MADE PART OF THE PURCHASE AND SALE AGREEMENT
BY AND BETWEEN
THE BANKRUPTCY ESTATE OF 90 NASSAU STREET LLC
AND
BERNART CAPITAL

    1.    In the event of any inconsistency, ambiguity or conflict between the provisions of the printed form of the Purchase and Sale Agreement attached hereto, (the "PSA"), and the provisions of this Rider, the terms and provisions of this Rider shall govern and control.

    2.    The attached collection report is true and correct as of the date of this PSA.

    3.    The Purchaser will receive a full security credit in the amount of $173,195 at the closing of the transaction.

    4.    No new leases will be entered into between now and the closing of this transaction. There are no other written leases beyond the ones shown on the collection report with the stated expiration dates.

    5.    The Seller shall be responsible for any brokerage fee that JLL is entitled to under this transaction.

    IN WITNESS WHEREOF, Seller and Purchaser have duly executed this Contract Rider as of the day first above written.

SELLER:                    PURCHASER:
THE BANKRUPTCY ESTATE OF      BERNART CAPITAL LLC
90 NASSAU STREET LLC


By:                        By: Ira Lifshutz
                             President

1

Rent Roll

Property: ZRG INC /90 nassau - 90 NASSAU STREET NEW YORK, NY 10038
Units: Active
As of: 06/09/2025
Include Non-Revenue Units: No

| Unit | Tags | BED /ark | Tenant | Status | Sqft | Market Rent | Rent | Deposit | Deposit Authorized | Lease From | Lease To | Moved In | Move Out | Past Due | NSF Count | Late Count |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ZRG INC /90 nassau - 90 NASSAU STREET NEW YORK, NY 10038 | | | | | | | | | | | | | | | | |
| Retail #1 | -/- | | The village in INS LLC | Current | | | 35,833.37 | 128,000.00 | 0.00 | 06/01/2016 | 07/31/2020 | 05/01/2018 | | 0.00 | 8 | 2 |
| Retail #5 | -/- | | Beauty Health Spa Inc. | Current | | | 5,871.64 | 18,000.00 | 0.00 | 12/01/2015 | 11/30/2020 | 12/01/2015 | | 0.00 | 1 | 4 |
| Unit #2 | -/- | | Ian Lafferette | Current | | | 6,250.00 | 6,875.00 | 0.00 | 11/01/2020 | 04/30/2024 | 11/01/2021 | | 0.00 | 0 | 3 |
| Unit #3 | -/- | | Robert Castman | Current | | | 7,000.00 | 7,000.00 | 0.00 | 05/31/2020 | 05/31/2021 | 05/31/2021 | | 0.00 | 0 | 7 |
| Unit #4 | -/- | | Jason B. Nohberg | Notice-Unrented | | | 7,000.00 | 7,000.89 | 0.00 | 06/01/2022 | 06/30/2025 | 06/30/2025 | 06/02/2025 | 1,141.12 | 4 | 14 |
| Unit #6 | -/- | | | Vacated-Unrented | | | | 0.00 | 0.00 | | | | | | | |
| Unit #6 | 250.00 | | | Vacated-Unrented | | | | 0.00 | 0.00 | | | | | | | |
| Unit #7 | -/- | | Benjamin Black | Current | | | 7,822.00 | 7,200.00 | 0.00 | 07/11/2020 | 06/30/2025 | 07/11/2021 | | 1,326.00 | 0 | 1 |
| Unit #8 | -/- | | Brian Muller | Current | | | 7,000.00 | 7,360.00 | 0.00 | 04/01/2021 | 07/31/2024 | 04/01/2021 | | 46,202.00 | 0 | 21 |
| 9 Units | | | | 77.8% Occupied | 8 | | 71,743.85 | 173,784.00 | 0.00 | | | | | 52,389.17 | 5 | 57 |
| Total 9 Units | | | | 77.8% Occupied | 0 | | 71,743.85 | 174,185.00 | 0.02 | | | | | 52,389.17 | 5 | 57 |

Created on 06/09/2025

# J. Ted Donovan

**From:** Irma Brignoni
**Sent:** Tuesday, June 17, 2025 2:36 PM
**To:** Kevin J. Nash; J. Ted Donovan
**Subject:** INCOMING WIRE - IOLTA

**Importance:** High

Please provide file number for the below wire received into IOLTA.

| | | |
|---|---|---|
| Jun 16, 2025 | FEDWIRE CREDIT VIA: BANKUNITED N.A/267090594 B/O: CB TITLE AGENCY OF NY LLC SHORT HILLS NJ 07078 REF: CHASE NYC/CTR/BNF=GOLDBERG WEPRIN FINKEL GOLDSTEIN NEW YORK NY 10017- US/AC     5978 RFB=202516700357 5 OBI=ESCROW RELEASE CBNY-7672 90 N ASSAU ST NEW YORK NY SENT BY CB TIT LE 973 .921.0990 IMAD: 0616F7B74M2C008247 TRN: 1250021167FF | Incoming wire transfer |



Irma Brignoni
Accounts Receivable Coordinator
Goldberg Weprin Finkel Goldstein LLP
125 Park Avenue, 12th Floor | New York, New York 10017
ibrignoni@gwfglaw.com
O: (212) 221-5700 D: (212) 301-6931

This message is intended for the sole use of the addressee, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the addressee you are hereby notified that you may not use, copy, disclose, or distribute to anyone the message or any information contained in the message. If you have received this message in error, please immediately advise the sender by reply email and delete this message.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal t ax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.